Case for argument, Westfield Insurance v. Vandenberg. Good morning, Your Honor. Peter Morse for Mr. and Mrs. Vandenberg. We're here today to ask this court to reverse the district court's grant of Westfield's motion for judgment on the pleadings and its denial of our motion for summary judgment. With all due respect to the underlying court, he was wrong on both the facts and the law. The court relied solely on an alleged misrepresentation in the application for the CGL policy, the words concrete construction, which were placed on the declarations page for the CGL policy under the business box. Those were the two bases of the court's ruling. There's no question that the court's ruling was therefore wrong as to the umbrella policy. The umbrella policy on the application for the question regarding whether Rose Paving owned a watercraft, it was left blank. There was no representation one way or the other as to whether they owned a watercraft. The umbrella policy declaration page doesn't even have a box in which to put in the words concrete construction or some other words. So there's no question, it's absolutely clear that the grant of judgment on the pleadings... Who owned the bench that Vandenberg fell off? It was owned by the owners of the boat, which was not Rose Paving. What was the name of it? What was the name of it? The boat? Was it Risky Business or something? It was something... Very unusual. Bad Influence. Thank you Judge, Bad Influence. But it definitely was not owned by Rose Paving. Bad Influence is an unusual name for a ship that's in the construction business, right? So you're saying the bench was owned by the owner of Bad Influence. Correct, the owners of the boat. And the owner was what, R&M? RQI, yes. A conglomerate of people, including Mr. Rose. So there's no question that... How far did he fall? He first, of course, fell off the bench to the ground and then he did fall... To the ground or to the boat or to what? To the level of the boat that the bench was sitting on. But did he fall onto the boat or did he fall off the boat? He definitely did not fall off the boat. He fell, it was two levels on the boat. He fell to a lower deck. He fell from the top all the way to the bottom of the boat. And there's no railing on the level he fell off of? Correct, there's no railing there. The bench was just up to the edge of the deck? It was close enough to the edge that when it goes over, he would continue on to the next level. We submit the district court was also wrong in its ruling on the primary CGL policy. There was no misrepresentation in the application regarding the ownership of watercraft. Rose Paving absolutely does not own this watercraft or any other watercraft. There's no suggestion that they do. That was just wrong. The bigger flaw is in the fact that the legal decision of the court, which ruled that because on the deck page of the CGL policy there's a box which says business and the words concrete construction was put in there, and that's all, that magically the Westfield policy only provides coverage for concrete construction. What's Rose Paving's business? It's a paving company. Paving and Sealing, their name is Rose Paving and Sealing. That's the name insured under this policy. Well, that's pretty remote from a boat, isn't it? Yeah, all kinds of companies do all kinds of things that are different than their names, different than their primary business. But there's nothing in the Westfield policy which says we only provide coverage for concrete construction. There's no words in the policy tying in to that box which used the words concrete construction. But you said R&M owns the boat. RQM, yes. Not Rose Paving. Definitely not Rose Paving and Sealing. What is their role then? What is their role? Yeah. Alan Rose of Rose Paving was one of the owners of the boat. He's not the applicant. He's not the name insured, but he qualifies as an insured, as an executive officer of the company. What does the company do with respect to the boat? They do have some involvement. They use it for entertaining their employees or customers. They also do, they are involved, people at Rose are involved when other people want to lease the boat from the owners of the boat. Their personnel are involved in that aspect of it. But it doesn't have anything to do with, it's not involved in the actual construction of anything. In the construction of the boat? No, no. In the concrete construction, it has nothing to do with. Concrete construction has nothing to do with anything, Your Honor. That's a word. As the other court, 18 months ago in the Philadelphia v. 1801, West Driven Park, they noticed that those words, they come from, those are class codes that insurance companies use, and that's all spelled out in the 1801 case, that insurance companies come up with to begin their premium analysis. It's some internal underwriting mumbo-jumbo that the insured don't come up with that phraseology. And it has nothing to do with the actual operation. Well, let me reiterate, the boat itself's function was to provide for, as you say, maybe hosting potential clients and that sort of thing. Yeah, correct. They would use it for that. They're a large paving company that has lots of customers. And provide entertainment for the owners. And their employees. The Philadelphia v. 1801 West Driven Park case gives examples of what an insurance company has to do if it wants the words that are placed on the declarations page regarding the business to actually limit coverage. They cite three or four other cases where the insurance company put language in there, which says we only provide coverage for liability arising out of the description of the business placed on the declarations page. Other companies have done that. Westfield absolutely did not do that. They don't even claim there's anything in their policy which ties in to that business description. The 1801 court also looked at that Second Circuit decision in Mount Vernon v. Belize. But clearly the insurance company, all it talks about is concrete. And of course it has this provision about lease of watercraft. Doesn't that make it sound as if it didn't want to insure against anything other than the actual paving business? If they had wanted to limit their policy in that way, as your Honor knows, this is universal insurance law, that they have to restrict the broad coverage grant of insurance policy with clear, concise, actual terms. And they don't have those. Well, I don't understand. When they say no lease, you know, no watercraft. They say they don't own, hire, or lease a watercraft. And they don't own. That's such a niggling distinction. You say that they control the boat. To some degree. Right? They use it for their business pals. The owners control it, but to some degree. Their customers. Yeah, well, why is that the equivalent of leasing a watercraft? They don't lease. Leasing is like, you know, you can either own a car or you lease a car. I don't get it. I don't understand. It looks to me as if the insurance company, it's insuring a paving company. Why would it mention watercraft leases? Because it's worried that, you know, maybe this company, to recruit customers and so on, maybe it has a boat.  And they didn't. They don't want to have anything to do with boats. Right? So that's what they say. Why isn't this close enough? If the application said, do you ever use a boat, and they lied about that, that would be another situation. That's not the question. The law is clear that application questions are construed as strictly as policy provisions. If they were bringing a misrepresentation in the application claim, which they clearly aren't because they clearly couldn't, they'd have to prove they had a clear question and a clear wrong answer. I don't get it. I don't understand it. It seems to me clear that this insurance company wanted to limit its coverage to the construction industry. That's what it knows about, presumably. All about concrete. It doesn't know anything about boats. So why would it be insuring against a boat accident? Because their coverage grant, under both the CGL policy and the umbrella policy, says we cover any bodily injury that's accidentally caused, period. It's a universal block. Not period. They excluded the watercraft. And then with exclusions. So if you want to talk about the watercraft exclusion, we cited the law which says that it clearly does not apply to a case like this. The Illinois cases like USFG versus State Farm. What do you mean a case like this? What's a case like this? A case where there's no movement of the boat, which in any way contributed to this injury. Oh, how do we know? Because all the evidence says that this boat. I don't believe it. Well, there's no contrary evidence. Look, when boats are sitting in water, they move. All the evidence says that this boat was not moving. I don't believe it. Well, in this case, that's all the evidence that there is. What is the evidence that the boat was completely stationary? People's testimony. The fact that this was sitting there for hours. It was a very large boat. Look, the boats, they sit there for hours. And they move slightly. Now, what's unfortunate about this accident, because of the placement of the bench, if someone leaned against the back of the bench and the boat was shifting even slightly, that would tend to destabilize the bench. So for all we know, some slight motion in a boat would cause the accident. Fortunately, there was an expert who looked at this bench and tested it on the ground. And whenever someone of Mr. Vandenberg's size turned back like that, do you see what was behind him? The bench tipped over. And the ground was not moving. That caused the bench to turn over. It was just the action. This is a flimsy, portable bench. It's not part of the boat. It's a bench they carry on to the boat. They usually use it on dry land. And when you turn like this, the bench goes over. And unfortunately, because of its placement, the injury was greatly aggravated. It wasn't just the bench. It was the fact there was no railing. That's what aggravated the injury. He would have fallen. The bench would have gone over like the expert showed every time. And he would have had some injury, maybe just a dislocated shoulder, broken wrist, a head injury. Who knows? But because it was also placed in a spot where he could go over the edge, the injury was definitely aggravated. I see my time is up. Thank you, Your Honor. OK. Thank you, Mr. Morris. Mr. Reeses? Good morning. May it please the Court, my name is Mike Reeses. And this time, I'm here for Westfield Insurance Company. The district court promptly granted judgment on the pleadings to Westfield against the defendants. First, the district court properly concluded that whatever risks were covered by the commercial policy, they did not include a chartered yacht business. Counsel talked about, well, this was just for business entertainment. It wasn't. The allegations are that they were marketing cruises. The website, I think, was Rose Paving slash Yachts of Fun. OK? It's a business. It's not part of construction. What was the second part? Yachts of Fun. Y-A-C-H-T-S. Yachts of Fun. Yachts of Fun, yes. During the application process, Rose Paving denied owning any watercraft, described itself as a contractor, and agreed that we were issuing the policy in reliance on its statements and that its statements were true and complete. Consistent with those statements, we issued a commercial policy to Rose Paving, whose business was described in the schedule of hazards and in the common declarations as concrete construction and work related to construction, reconstruction, repair, or building erection. The policy conditions provide that the representations and the declarations were the basis for the issuance of the policy. When counsel says there's no policy language that talks about what risks and hazards we insure and what we don't insure, he's wrong. The representations that they made in the declarations were the basis for the scope of coverage. And nothing about those representations would put us on notice that its activities included a separate and unrelated chartered yacht business. Based on those representations, we did not sell and Rose Paving did not buy coverage for activities related to a chartered yacht. Was there any other insurance coverage involved? Yes, there was. They went out, RQM went out, and they bought a separate policy that covered the yacht, and it was that policy which provided the bulk of the paid settlement proceeds of $2.3 million. The Westfield policy must be construed as a whole and not in a vacuum, taking into account the risks undertaken and purchased, the subject matter, and the purpose of the entire contract. And the parties never intended that the policy would cover losses associated with chartering a 75-foot yacht for cruises. Now, other courts have already addressed a similar issue. What amount are they seeking to recover from you? I'm sorry? What amount are they seeking to recover from you? Well, the settlement was for $25 million, so I suppose if you deduct $2.3, I guess it would be roughly around $22.7. We did provide $11 million in coverage, so they're seeking an amount in excess of the policy. Our brief discusses a number of cases that have addressed similar issues. Was Mr. Morse correct that the bench was owned by the paving company? Your Honor, there is nothing in the record, nothing in the pleadings that were filed that answers that question. What we have is, in the original complaint, there's nothing alleged about the ownership of the bench other than, you know, it was on the yacht, on the top deck, near the unguarded edge where he fell. In the first amendment complaint that was never filed, it's simply alleged that the defendants collectively provided the bench. We're talking about the duty to defend. And this case was decided based on what was within the four corners of the complaint. So, to answer that question, there is nothing that I know of, even going outside the four corners of the complaint, that definitively answers that question. To me, it doesn't matter. Based on the two issues, the one that the district court decided the case on, and based on the exclusion, it wouldn't matter who owned the bench. Mr. Reese, just getting back to the law you were talking about, is there any Illinois authority that squarely supports your view that the declaration of the business of the owner of the policy really controls the scope of the insurance afforded? I think that the best case would be the Hartford v. Dash Messenger case where the court looked at the application and said, to the insurance company, that based upon the application, the insurance company should have been on notice of whether the risk was inherent in the business. That's Hartford. Now, we've got the converse of that. The converse is that we wouldn't have been put on notice from the application that they were running chartered yachts, yacht cruises. So I would have to rely on Hartford if we're talking about Illinois cases. Cases outside Illinois clearly would hold that the representations would be a limitation on the scope of coverage. And your view is that's the majority rule in the United States? My view would be that's the majority rule, and the few cases cited are distinguishable. Even the Philadelphia indemnity case did not question that those cases would apply if you had a business that had multiple and separate unrelated activities, and it had insurance for one, like construction, and then it's operating a separate business for which it's trying to get coverage. I want to talk about the exclusion briefly because it is an alternative ground for affirmance. Defendants argue that the exclusion would apply only if the claim fully depended on the use of the excluded watercraft. Based on an Illinois Supreme Court decision, Northbrook, Illinois law could not be any clearer. The exclusion applies unless the injuries arose from events wholly independent of the use of the watercraft. That did not happen here.  derived from the use of a yacht during a chartered cruise without adequate railings or fall protection in violation of regulations that require railings on commercial vessels. Paragraph 2 of the underlying complaint alleged that Rose Paving was a booking agent and marketed the yacht. That's the yachts of fun. Paragraph 10 alleged that Rose Paving and others advertised, chartered, owned, and operated the yacht. The injury could not have happened unless the bench was placed near the unguarded top deck of the yacht. Did this craft actually get underway or was this something that happened? My understanding, it's not clear from the complaint within the Four Corners, but it was within the harbor and I don't think it has anything to do with the application exclusion, but I think his argument is a red herring about whether there was any movement of the boat or not. I think it's just speculation on his part. If you don't have the facts, I guess you do what you can do. But the point is that the yacht presented a fall risk from a height, from 20 feet up because of a defective condition, the lack of a railing. And that is a cause of the accident. What exactly did the exclusion say, sir? The exclusion? Please paraphrase if you want. Well, what the exclusion says essentially is that you know what, I'm going to go right to it. I don't want to be accused of misquoting. Eliminates coverage for bodily injury, arising out of ownership, they're alleged to be an owner, maintenance, use, they were using it, of any watercraft owned or operated by or rented or loaned to any insured. So if any insured falls within that scope of the exclusion, everybody's excluded who's an insured. Because if any insured is eliminated from coverage, that includes all of them without exception. Counsel talks about the bench, but the point is that there's no separate compensable injury attributable to the bench per se as opposed to the unguarded top deck. Each of his claims was inextricably intertwined, that's the language from Nautilus, a decision from the Seventh Circuit from three years ago, and was not independent of the use of the yacht without adequate fall protection. Therefore, the exclusion applied, and we owe no duty to defend or indemnify. We're going to stand on the, I see my time's up, we're going to stand on the other grounds presented in our brief. I do want to remind the Court that we also have argued the unnamed joint venture terms because all of the conduct at issue here related to a joint venture. For all the reasons set forth in our brief, we ask you to affirm. Thank you. Okay, thank you, Mr. Reiss. Mr. Morris? Your Honor, the Northbrook case and any other case in Illinois which enforced a vehicle exclusion in a general liability policy, every single one of them, the vehicle was moving. In Northbrook, the school district drove its bus onto the train tracks and was hit by a train. In the other cases, they negligently supervised their employee who was driving a vehicle. Every single time in Illinois that a vehicle exclusion policy and a general liability policy is enforced, the vehicle's moving. In the cases where they don't apply it, the vehicle's not moving, like the USF&G v. State Farm cases we cite where the student was getting off a bus, like the Mount Vernon v. Heaven Little Hands case where the daycare left a child in a van who then died from heat exposure. Yes, a vehicle was involved in those cases, but it did not arise out of the ownership, maintenance, or use solely of a vehicle, and therefore the exclusion in the general liability policy didn't apply. It's a bright, crystal-clear line between the cases where it applies and where it doesn't apply, and ours is clearly in the part where the vehicle's not moving. No one's driving this boat, it's not cruising along Lake Michigan hitting waves and knocking benches over. It's tied up in a sheltered harbor with other boats for hours, serving as a platform, had nothing to do with the bench going over. We also are not seeking anything more than their policy limits, Your Honor. We've never said that in our briefs. We've said the opposite in our briefs to make that crystal clear. We're not claiming that they're in bad faith or anything else. Their policy limits are what they are under their primary and their umbrella policies, and they clearly owe it in this situation under the Guillain cases. So what is that figure, I ask? There was a settlement for $25 million, and there was other insurers, other defendants involved. There's no question the value of the case is worth double that. We attached our motion for summary judge in many jury verdicts showing $50 million. There's no set figure at this point. For them, it's $11 million. The settlement was well beyond their policy. They owe their policy limits. Okay, well, thank you very much. Thank you, Your Honor.